**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 18a0644n.06**

**No. 17-6001**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Dec 26, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| LAMONT FORTUNE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: CLAY and GRIFFIN, Circuit Judges; ZOUHARY, District Judge.[*]

ZOUHARY, District Judge.

Defendant-Appellant Lamont Fortune was one of several participants in a multi-state conspiracy to distribute cocaine base (or crack cocaine). A jury convicted Fortune of conspiring to distribute 280 grams or more of crack cocaine under 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and of distributing 28 grams or more of crack cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). The district court sentenced Fortune to 272 months in prison, followed by ten years of supervised release. Fortune now challenges both his conviction and sentence on multiple grounds.

For the reasons below, we **AFFIRM**.

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

**BACKGROUND**

In November 2015, Fortune and three codefendants (Heyward Dargan, Jr., Daequon Davis, and Charles Loftly) were charged with conspiring to distribute crack cocaine. Although his codefendants accepted plea agreements, Fortune proceeded to trial, where Loftly and Dargan testified against him. After a two-day trial, the jury found Fortune guilty.

**21 U.S.C. § 851 Informations**

The Government sought a sentencing enhancement based on Fortune's prior convictions. Before trial, the Government filed three Section 851 notices identifying the prior conviction(s) for an increased punishment. The first relied on a November 1997 cocaine conspiracy conviction from the Superior Court of Surry County, North Carolina. The second relied on both the November 1997 conviction and a December 1999 possession conviction from the Circuit Court of Grayson County, Virginia. Two days before trial, the Government filed the third Section 851 notice, which only referenced the earlier noticed December 1999 conviction. After trial but before sentencing, the Government "correct[ed] a clerical mistake" regarding the December 1999 conviction, amending the case number from "CR99000228-00" to "99-167."

**Traffic-Stop Video**

On the first day of trial, defense counsel objected to a video from a May 1, 2015 traffic stop involving Fortune. The stop resulted in a high-speed chase and criminal charges against Fortune. Defense counsel argued the video should be excluded under Federal Evidence Rule 404(b) as prior-bad-act evidence and because the video was irrelevant and highly prejudicial. The Government responded that the video was outside the scope of Rule 404(b) because the stop occurred "within the time of the conspiracy," and coconspirators would establish Fortune admitted to throwing crack cocaine out of his car during the chase.

-2-

The district court agreed with the Government and admitted the video. Further, even if Rule 404(b) applied, the court found the video was admissible to show preparation or plan. The court offered to "provide a 404(b) curative instruction to the jurors after the video [was] played if the lawyers so desire[d]," but neither party requested an instruction.

**Testimony at Trial**

The Government presented five witnesses at trial: Tennessee Police Investigators and FBI Task Force Officers Thomas Garrison and Matthew Gryder; codefendants Loftly and Dargan; and Deputy Sheriff Steven Brant Bottomley. Fortune did not present any witnesses.

*Officers Garrison and Gryder*

Officers Garrison and Gryder began investigating this crack-cocaine conspiracy around February 2015. The suspected coconspirators included Fortune, his three codefendants (Loftly, Dargan, and Davis), Hiram McGirt, and Thomas Newman. Based on surveillance of these individuals, the officers believed the coconspirators were working together to bring crack cocaine into Johnson City, Tennessee, before distributing it throughout the area. Although Johnson City was the "destination city," Officer Garrison believed the crack cocaine was coming from larger cities "in North Carolina or perhaps New York."

Officer Garrison testified that "there wasn't really anyone at the top" of the conspiracy: the coconspirators worked as a "group, . . . going to each other whenever they needed drugs." Because these individuals were interacting frequently, working with cooperating codefendants was sometimes difficult for law enforcement.

Loftly and Dargan began cooperating with law enforcement in July 2015, but neither knew the other was cooperating. Officers orchestrated several controlled buys through these individuals; two involved Fortune.

In late July 2015, Loftly surrendered to law enforcement two ounces of crack cocaine Fortune had fronted him. Seeing an opportunity, the officers arranged for Loftly to meet with Fortune to pay for the drugs. Before the meeting, the officers searched both Loftly and his vehicle. They then fitted the vehicle with recording equipment, gave Loftly $2,400 to pay Fortune, and sent him on his way.

Loftly picked up Fortune at the apartment of Dargan's grandmother, and the two drove together to Bristol, Tennessee. Once they arrived, Fortune went inside a house on Georgia Avenue. After Fortune returned to the car, he told Loftly he "got one and a half for [him]." After the exchange, the officers met with Loftly and retrieved about 1.5 ounces of crack cocaine. Audio and video recordings of these events were presented to the jury.

The next evening, the officers arranged for Loftly to meet with Fortune again to pay for the new 1.5 ounces of crack cocaine. The officers repeated the search of Loftly and his vehicle. Loftly then drove to the same Georgia Avenue house in Bristol. Once Loftly arrived, Fortune walked up to his vehicle and money was exchanged. Recordings of these events were also presented to the jury. According to Officer Garrison, "you can't see everything great" in the video, but "you can hear Mr. Fortune and you can see money exchange hands."

### Codefendants

Both Loftly and Dargan pled guilty to the underlying drug conspiracy and testified in hopes of receiving "some leniency" at sentencing. They disclosed their extensive criminal histories and acknowledged they were housed in the same jail pod before trial.

Loftly and Dargan also discussed, at length, the nature of the conspiracy and Fortune's role in it. They testified that Fortune became involved in the drug ring around September 2014. They believed Fortune was getting crack cocaine from North Carolina, "sometimes weekly . . .

-4-

[sometimes] biweekly." Fortune would usually bring back several ounces on each trip because the coconspirators "all had to buy a couple of ounces" from him. Loftly estimated he purchased between 500 and 600 grams of crack cocaine from Fortune between September 2014 and July 2015, and Dargan estimated he made ten to fifteen purchases during a similar time period. Loftly further discussed the two controlled buys involving Fortune.

Finally, Loftly and Dargan testified that on the evening of May 2, 2015, several of the coconspirators were at Loftly's house watching a boxing match when Fortune arrived. Loftly and Dargan testified that, after Fortune arrived, he admitted to throwing out eight to nine ounces of crack cocaine during the high-speed chase the previous day. Both Loftly and Dargan were expecting crack cocaine from Fortune at the time. But due to the chase, Fortune was forced to "sho[o]t the crack cocaine out the window" and was unable to make the delivery as expected.

### *Deputy Bottomley*

Deputy Bottomley was the officer that stopped Fortune on May 1, 2015. His testimony was short. The stop occurred in Carroll County, Virginia, near the North Carolina border. Deputy Bottomley explained that, as he approached Fortune's vehicle, Fortune sped off, resulting in a chase reaching speeds up to 122 mph. The Government played video clips of the stop and chase. The clips showed that, at times, Fortune "got pretty far ahead" of Deputy Bottomley, and that Deputy Bottomley got stuck behind other vehicles. Deputy Bottomley acknowledged there was "no way [he] could tell" if Fortune threw anything out of his car, and nothing was recovered.

When the chase ended, Deputy Bottomley walked over to Fortune's car. He smelled burnt marijuana and witnessed Fortune eating marijuana. Fortune was subsequently arrested. Fortune was released the following day, on May 2, 2015—*i.e.*, the day he joined Loftly and Dargan to watch the boxing match.

**Sentencing**

Before sentencing, Fortune objected to a recommended enhancement under USSG § 3C1.2 for reckless endangerment. The district court overruled the objection, finding Loftly, Dargan, and Deputy Bottomley's testimony about the May 2015 chase was sufficient to support the enhancement. The district court calculated Fortune's Guidelines range as 262 to 327 months, with a 240-month mandatory minimum. After hearing arguments from the Government and Fortune, the district court imposed a sentence of 272 months.

## DISCUSSION

**Admissibility of the Traffic-Stop Evidence**

Fortune first argues the district court erred in admitting evidence of the May 2015 traffic stop and high-speed chase because it was extrinsic to the charged conspiracy and was admitted solely to show he "had connections with marijuana and therefore was a drug dealer." Although Loftly and Dargan testified that Fortune admitted to throwing out crack cocaine during the chase, Fortune argues this evidence was "minimal and not credible" because Loftly and Dargan were "motivated to implicate [him] in a way that pleased the government." Further, even if the traffic-stop evidence were admissible under Rule 404(b), Fortune argues its probative value was substantially outweighed by the risk that the jury would convict him not based on evidence of the conspiracy, but because he has the character of a drug dealer and once evaded arrest.

This Court generally "reviews all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003). A district court abuses its discretion when it "make[s] errors of law or clear errors of factual determination." *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (citation omitted). But even where a district court errs in admitting evidence, this Court

will not reverse "unless [the] error affects a substantial right—that is, if the error had a substantial and injurious effect or influence on the jury's verdict." *United States v. Shannon*, 803 F.3d 778, 785 (6th Cir. 2015) (citation and internal quotation marks omitted). "In determining whether an error is harmless, the reviewing court 'must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.'" *United States v. Hardy*, 228 F.3d 745, 751 (6th Cir. 2000) (alteration in original) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

Rule 404(b) prohibits admitting "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that[,] on a particular occasion[,] the person acted in accordance" with that character trait. Such evidence, however, may still be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

"Rule 404(b) is not implicated when evidence of prior acts is 'part of a continuing pattern of illegal activity' or is 'inextricably intertwined' with the indicted crime." *United States v. McGee*, 510 F. App'x 377, 381 (6th Cir. 2013) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)). To qualify as intrinsic evidence, the conduct must have "a causal, temporal or spatial connection with the charged offense." *Hardy*, 228 F.3d at 748. "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id*. To be admissible, intrinsic evidence, like all evidence, must satisfy the balancing requirement of Rule 403: its probative value must not be substantially outweighed by a risk of unfair prejudice to the defendant. *See United States v. Adams*, 722 F.3d 788, 812 (6th Cir. 2013).

Here, the district court did not err by admitting the traffic-stop evidence as intrinsic evidence because testimony from multiple witnesses established the stop was temporally, spatially, and causally connected to the charged conspiracy. *See Hardy*, 228 F.3d at 748. First, the stop occurred while Fortune was actively involved in the conspiracy. Second, testimony from Officer Garrison, Loftly, and Dargan provided a spatial and causal link between the conspiracy and the stop near the North Carolina border. Their testimony indicated that the crack cocaine involved in the conspiracy was coming from North Carolina, and that Fortune regularly made trips between Tennessee and North Carolina for the purpose of obtaining conspiracy-related crack cocaine. According to Loftly and Dargan, that is exactly what Fortune was doing at the time of the stop.

This testimony is sufficient to show the traffic stop was "inextricably intertwined" with the charged conspiracy because it "explain[s]" and "tend[s] to establish the charged conspiracy itself." *Hardy*, 228 F.3d at 748–50. Contrary to Fortune's assertions, time is not the only factor connecting the stop and the conspiracy—there is also an overlap in geography, actors, and purpose.

To the extent Fortune argues this evidence is insufficient because Loftly and Dargan testified under cooperation agreements, his argument is unpersuasive. First, this Court has repeatedly found testimony from cooperating witnesses sufficient to connect other wrongful conduct with a charged offense. *See, e.g.*, *United States v. Gonzalez*, 501 F.3d 630, 633–36, 638–40 (6th Cir. 2007); *Barnes*, 49 F.3d at 1146, 1149. Second, Fortune was given an opportunity to cross-examine Loftly and Dargan. The jury had an opportunity to evaluate and weigh this testimony before reaching a verdict.

Fortune complains that "[t]he district did not explain *how* it arrived at the conclusion that the traffic stop and flight were intrinsic to the charged conspiracy," emphasizing that "the finding was made *before* any testimony potentially connecting the events to the conspiracy." But both the

Government and defense counsel summarized Loftly and Dargan's anticipated testimony before the district court made its ruling. The reasons for the ruling are clear from the record.

Nonetheless, Fortune argues the district court erred in admitting the traffic-stop evidence under Rule 403 because it had "little to no probative value," and any value was substantially outweighed by the risk that it would unfairly bias the jury against him. This Court reviews Rule 403 determinations for abuse of discretion, "maximiz[ing] the probative value of the challenged evidence and minimiz[ing] its potential for unfair prejudice." *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006).

Fortune's central argument is that the video and Deputy Bottomley's testimony had little probative value because Fortune "did not deny the stop or flight occurred," and neither the video nor Deputy Bottomley's testimony corroborated that he threw crack cocaine from his car. But Fortune did not offer to stipulate that the stop occurred. Further, this evidence corroborates testimony about not only where, when, and how the stop occurred, but also Fortune's role in the conspiracy.

Finally, the video was short, as was Deputy Bottomley's testimony. The parties also spent limited time questioning Loftly and Dargan about the incident. The primary focus at trial was the relationship between the coconspirators, Fortune's role in the conspiracy, and the two controlled buys. Considering the totality of the record, even if the district court erred in admitting this evidence, the error was harmless as it did not "materially affect[]" the verdict. *See United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (citation omitted).

**Increased Mandatory Minimum**

Next, Fortune argues the district court erred in applying an increased mandatory minimum based on his December 1999 conviction because the Government failed to strictly comply with

21 U.S.C. § 851(a). "The requirements delineated in § 851 are mandatory, and a district court cannot enhance a defendant's sentence based on a prior conviction unless the government satisfies them." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997). Section 851 states that "[n]o person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless *before trial*, . . . the United States attorney files an information" providing "the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1) (emphasis added). However, "[c]lerical mistakes in the information may be amended *at any time* prior to the pronouncement of sentence." *Id.* (emphasis added).

Fortune contends the Government's failure to provide the correct case number for his prior conviction was more than a clerical mistake. Because this mistake was not corrected until after his trial, Fortune argues he did not receive sufficient notice under Section 851.

Challenges to the sufficiency of a Section 851 information are generally reviewed *de novo*. *United States v. Pritchett*, 496 F.3d 537, 541 (6th Cir. 2007). But Fortune failed to challenge the timeliness or sufficiency of the Section 851 information before the district court. Therefore, we review for plain error. *United States v. Gonzalez*, 512 F.3d 285, 288 (6th Cir. 2008). Fortune's challenge fails under either standard.

Section 851 does not define clerical mistake or describe "the specificity with which the government must identify prior convictions." *United States v. Layne*, 192 F.3d 556, 576 (6th Cir. 1999). This Court has recognized, however, that Section 851 "was designed to satisfy the requirements of due process and provide the defendant with reasonable notice and an opportunity to be heard regarding the possibility of an enhanced sentence." *King*, 127 F.3d at 489 (citation and internal quotation marks omitted). "So long as the defendant had reasonable notice of the government's intent to rely on a particular conviction to seek an enhancement, as well as the

opportunity to contest the enhancement, we have regularly affirmed enhanced sentences despite the government's fumbling of the § 851(a) requirements." *United States v. Brown*, 737 F. App'x 741, 749 (6th Cir. 2018) (citing cases).

In this case, the Government provided Fortune with reasonable notice that it intended to rely on his December 1999 conviction to enhance his sentence. The second and third notices submitted before trial accurately disclosed the date of the conviction, the offense, the date of the offense, the relevant court, and Fortune's ultimate sentence. The only error was the reported case number. Importantly, Fortune does not assert this error *actually* confused or misled him. Nor does the record provide a basis for such a finding: this was Fortune's only conviction in 1999, and his only conviction in Grayson County. Considering the wealth of other accurate details disclosed, providing the wrong case number was a simple clerical mistake. Finding more would "elevat[e] form over substance," a result this Court has repeatedly stated should be avoided. *See, e.g.*, *King*, 127 F.3d at 489.

Further, at sentencing, the district court asked Fortune if, "on December 3, 1999, in the Circuit Court for Grayson County, Virginia" he was convicted of possession with the intent to distribute. The district court warned Fortune that "[a]ny challenge [to the conviction] . . . not made before the sentence is imposed may not be raised hereafter." Still, Fortune responded "[y]es" and raised no challenges to the conviction.

Fortune asserts this colloquy did not render the error harmless because "the district court made the same error" at sentencing as the Government made in its earlier filing—stating the wrong case number. But the district court stated the case number was "CR99000167-00"—the same case number reported in the presentence report and the same case number, in long-form, as supplied in the Government's amended notice ("99-167").

Fortune also argues the district court violated his constitutional rights by applying the increased mandatory minimum because the prior conviction was not charged in the Indictment or found beyond a reasonable doubt by the jury. But, as Fortune recognizes, this Court has repeatedly rejected this argument. *E.g.*, *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013).

**USSG § 3C1.2 Enhancement**

Fortune next challenges the district court's enhancement of his sentence under USSG § 3C1.2, based on the May 2015 high-speed chase. Section 3C1.2 provides for a two-level enhancement "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." The enhancement applies if "this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *United States v. Woods*, 604 F.3d 286, 292–93 (6th Cir. 2010) (citation omitted). "The burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

This Court reviews "the district court's application of the . . . Sentencing Guidelines de novo and the district court's findings of fact at sentencing for clear error." *United States v. Dial*, 524 F.3d 783, 785 (6th Cir. 2008) (citation omitted). The "question of what constitutes [reckless] endangerment is a mixed question of law and fact." *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005). But because the inquiry is "highly fact-based," this Court gives "significant deference to the district court." *Id.*

Here, Fortune does not dispute that the high-speed chase occurred or that he recklessly created a substantial risk to others during the chase. He challenges only whether the Government established a nexus between the chase and the charged conspiracy. Based on the evidence

introduced at trial, the district court found that "[t]he credible testimony of codefendants Loftly and Dargan satisf[ied] the court by a preponderance of the evidence that [Fortune] threw conspiracy-related cocaine out of his car during the flight, and that he was thus 'fleeing from a law enforcement officer in the course of attempting to avoid detection or responsibility' for an offense of conviction."

Fortune challenges the district court's credibility determination. But a "sentencing court's credibility determinations, like other factual findings, must be accepted on review unless shown to be clearly erroneous." *United States v. Hurst*, 228 F.3d 751, 761 (6th Cir. 2000). Fortune fails here as well. Because the district court's determination was "plausible in light of the record viewed in its entirety," it was not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). Dargan and Loftly's credible testimony was sufficient to support the enhancement.

**Substantive Reasonableness of Sentence**

Fortune's final challenge is that his sentence is substantively unreasonable because (1) it is "overwhelmingly based upon drug quantity," and (2) the district court failed to take into account his age. Both arguments are unpersuasive.

This Court reviews the substantive reasonableness of a sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). Fortune carries the burden of showing his sentence is substantively unreasonable. *United States v. Woodard*, 638 F.3d 506, 510 (6th Cir. 2011). Because his sentence falls within the Guidelines range, it is presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc). Fortune fails to rebut this presumption.

Contrary to Fortune's assertions, nothing in the record reflects that the district court placed "overwhelming" weight on drug quantity. Rather, the district court properly considered all of the Section 3553(a) factors, including Fortune's "long criminal history" and "long history of violating [his] conditions of supervised release or probation." The "thing that really bother[ed]" the district court was Fortune's limited work history outside of selling drugs, and the fact he "seem[ed] very comfortable" in following a career as a drug dealer.

There is no denying that drug quantity played *a role* in the sentence. But as the Government points out, USSG § 2D1.1 specifically ties a defendant's drug quantity to the length of his sentence, and Fortune's base-offense level was calculated under this Guideline. The district court was required to consider the Guidelines range when selecting Fortune's sentence. *See* 18 U.S.C. § 3553(a)(4)(A). Simply put, Fortune fails to show the district court abused its discretion by declining to vary downward.

Fortune argues his sentence is substantively unreasonable because the district court failed to consider the likelihood of recidivism after age fifty, relying on *United States v. Payton*, 754 F.3d 375 (6th Cir. 2014). But that case is inapposite. First, the district court in *Payton* deviated substantially from the advisory Guidelines range. *Id.* at 378. Fortune received a Guidelines sentence. Second, the defendant in *Payton* raised the age arguments before the district court. *Id.* The only mention of Fortune's age at sentencing was a passing reference by defense counsel that an above-the-minimum sentence was "extreme . . . for a young man like" Fortune. Finally, *Payton* found the recidivism evidence sufficient to require a sentencing judge to explain more carefully why a defendant "remains likely to engage in violent [crime] *between the age of seventy and ninety*." *Id.* at 379 (emphasis added). Fortune's sentence will expire well before he turns seventy. This Court has previously declined to extend *Payton* on similar grounds. *See, e.g.*, *United States*

*v. Henry*, 722 F. App'x 496, 501 (6th Cir. 2018); *United States v. Taylor*, 800 F.3d 701, 715–16 (6th Cir. 2015).

## CONCLUSION

For these reasons, the judgment of the district court is **AFFIRMED**.